442 Mass. 463 (2004)                                    463

Local 1652, International Association of Firefighters *v.* Town of Framingham.

## Local 1652, International Association of Firefighters *vs.* Town of Framingham & others.[1]

Middlesex. April 8, 2004. - August 16, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Statute,* Appropriation of money. *Municipal Corporations,* Budget, Collective bargaining, Town meeting.

This court concluded that town officials could not fulfil their obligation under G. L. c. 150E, § 7 (*b*), by submitting to town meeting a budget that made full funding of a staffing provision contained in a multi-year collective bargaining agreement contingent on a potential property tax override pursuant to G. L. c. 59, § 21C. [467-478] Sosman, J., dissenting, with whom Marshall, C.J., and Cordy, J., joined.

Civil action commenced in the Superior Court Department on April 8, 2002.

The case was heard by *Leila R. Kern,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Leo J. Peloquin & Christopher J. Petrini,* Town Counsel, for the defendant.

*Harold L. Lichten* for the plaintiff.

The following submitted briefs for amici curiae:

*Patrick N. Bryant* for Massachusetts Coalition of Police.

*Philip Collins & Daniel C. Brown* for Massachusetts Municipal Association.

Ireland, J. We transferred this case to this court on our own

---

[1]The town manager and the board of selectmen of Framingham. We shall refer to these defendants, the town's executive branch, as the "town officials." The town manager reports to the board of selectmen.

We acknowledge amicus briefs of the Massachusetts Municipal Association and Massachusetts Coalition of Police. We strike the brief of the Professional Firefighters of Massachusetts, because it was submitted by the same law firm (and attorney) who represented the union in this case. Briefs of amici curiae are intended to represent the views of *non*parties.

motion to consider whether town officials may fulfil their obligation under G. L. c. 150E, § 7 (*b*), by submitting a budget that makes full funding of a staffing provision contained in a multiyear collective bargaining agreement contingent on town voters approving a "Proposition 2 1/2" override (override) to cover a budget shortfall (G. L. c. 59, § 21C). In *Billerica* v. *International Ass'n of Firefighters, Local 1495*, 415 Mass. 692 (1993) (*Billerica*), at issue was the enforceability of a minimum staffing provision contained in a multiyear collective bargaining agreement. In the second year of that agreement, the town's administrator failed to submit a request to the town meeting for funding the provision. *Id.* at 693. The court held, inter alia, that such a request had to be submitted to the town meeting pursuant to G. L. c. 150E, § 7 (*b*), and, in the absence of such a submission, the fire fighters' remedy was to "seek a court order compelling the town administrator . . . to submit [such] request." *Id.* at 696.

In this case, a Superior Court judge, pursuant to *Billerica, supra*, granted the request of the plaintiff union for a preliminary injunction ordering town officials to submit a request for full funding of a minimum staffing provision in the third year of the fire fighters' three-year collective bargaining agreement. Town officials had submitted a budget that made full funding of the staffing provision contingent on the town's voters passing an override to cover a budget shortfall. See G. L. c. 59, § 21C, inserted by St. 1980, c. 580, § 1. We conclude that town officials may not fulfil their obligation under G. L. c. 150E, § 7 (*b*), by submitting a budget that makes full funding of a staffing provision contingent on a potential property tax override pursuant to G. L. c. 59, § 21C.

*Facts and procedural background.* The basic facts are not in dispute. The town and the union entered into a three-year collective bargaining agreement covering July 1, 2000, until June 30, 2003. The only provision relevant to our discussion is art. III, § 7, which required a minimum staffing level of thirty fire fighters on each shift (staffing provision). The staffing provision became an issue in fiscal year 2002, when there was a projected budget shortfall of approximately seven per cent. In April, 2002, town officials prepared a budget to submit to the town meeting

that did not call for unconditional full funding of the staffing provision. Instead, town officials proposed a contingency budget and an alternative balanced budget. The contingency budget included full funding of the fire fighters' staffing provision, only if the voters approved an override to fund the budget shortfall. The balanced budget, proposed in the event that an override failed, called for a reduction of approximately seven per cent from all town departments, including the fire department.

In material submitted to the town meeting members, town officials "recommended" the contingency budget. In the section of its budget that specifically covered the fire department's operating budget, the staffing provision was discussed as follows:

> "It is important to keep in mind that the Firefighters Contract contains a staffing provision that calls for 30 (thirty) firefighters, including 6 (six) officers, to be on duty at all time. The balanced budget, as presently constituted, cannot maintain that level of staffing. This staffing provision can be funded by the contingency budget, which is the recommendation. If a member of Town Meeting desires to assure funding in the balanced budget that is sufficient to fund the staffing provision, the member should make the appropriate motion to have Town Meeting re-allocate $725,837 of funding from other municipal budgets to the Fire Department budget."

The contingency budget's proposed override would have funded not only the shortfall for the fire fighters' staffing provision, but also the shortfall in all departments. Moreover, if the override did not pass and the balanced budget was adopted, the fire fighters stood to lose fourteen positions, thereby affecting the staffing provision.

Prior to the town meeting at which the budget was to be discussed, the union requested a preliminary injunction requiring town officials to submit a budget that fully funded the staffing provision. In granting the union's request, the judge noted that the relevant provision of the Proposition 2 1/2 statute, G. L. c. 59, § 21C (*m*), addressed the legislative branch (in this case, the town meeting), whereas G. L. c. 150E, § 7 (*b*), addressed

the executive branch.[2] Relying on the statutes and the holding in *Billerica, supra,* the judge stated that town officials could not fulfil their obligation to submit a budget containing full funding for the staffing provision, under G. L. c. 150E, § 7 (*b*), by proposing an override to cover the shortfall. Citing the *Billerica* case, the judge concluded that seeking an injunction was the union's sole remedy. She noted that the town meeting was not required to fund the staffing provision request fully.

The town appealed from the judge's decision to grant the preliminary injunction and enter a declaratory judgment to the Appeals Court. Meanwhile, town officials complied with the order. They proposed full funding of the staffing provision with the shortfall covered by a rubbish removal fee. The town meeting voted to approve the funding. Ultimately, the rubbish removal fee was not instituted because the town's voters approved an override that fully funded the staffing provision. The union filed a motion to dismiss the town's appeal of the injunction because the issue was moot. The motion was denied.[3]

Before turning to our discussion, we note that because the issue whether the injunction was proper is moot, it would serve no purpose to analyze the judge's decision pursuant to the standard of review set out in *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 615 (1980). Instead, if only because it is capable of repetition, we focus on the salient legal issue. *Boston Herald, Inc. v. Superior Court Dep't of the Trial Court,* 421 Mass. 502, 504 (1995). See *Commonwealth v. Gomes,* 419 Mass. 630, 631 n.2 (1995), and cases cited (where issue is of significant public importance, consideration of moot case is matter of judicial discretion).

---

[2]General Laws c. 150E, § 7 (*b*), provides, in pertinent part: "The employer . . . shall submit to the appropriate legislative body within thirty days after the date on which the [collective bargaining] agreement is executed by the parties, a request for an appropriation necessary to fund the cost items contained therein. . . ."

The employer is the "chief executive officer" of a town. The legislative body for a town is the town meeting. Cost items are "the provisions of a collective bargaining agreement which require an appropriation by a legislative body." G. L. c. 150E, § 1.

[3]The events that unfolded after the judge issued the injunction are contained in affidavits submitted by the parties to the Appeals Court in response to the union's motion to dismiss the appeal as moot.

*Discussion.*[4] The town does not dispute that, under G. L. c. 150E, § 7 (*b*), it had an obligation to submit a request to the town meeting for full funding of the staffing provision. Rather, the town asserts that the part of its contingent budget that relied on an override met the requirements of G. L. c. 150E, § 7 (*b*). The town argues, in essence, that nothing in the language of either statute prevents town officials from using the override statute to fulfil their obligation under G. L. c. 150E, § 7 (*b*).

1. *G. L. c. 150E, § 7 (b).* The union points out that, under the contingent budget, the only way full funding could have been considered by the town meeting was if a town meeting member took the town's advice to "make the appropriate motion . . . to re-allocate . . . funding from other municipal budgets to the Fire Department." The union contends that the plain language of G. L. c. 150E, § 7 (*b*), as well as decided cases, support its argument that town officials had to submit an unconditional request for full funding of the staffing provision for a vote by the town meeting. We agree.

"General Laws, c. 150E is a comprehensive scheme which governs the collective bargaining rights of public employees" and "promotes harmonious and cooperative relationships between government and its employees." *Boston Teachers Union, Local 66* v. *Boston*, 382 Mass. 553, 559, 564 (1981), quoting 1973 House Doc. No. 6194, Appendix B. General Laws c. 150E, does not require municipalities to negotiate with unions over staffing provisions. See *Billerica, supra* at 694; *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 212 & n.20 (1982); *Town of Danvers*, 3 M.L.C. 1559, 1571, 1573 (1977) (discussing public policy reasons public employer must have flexibility to manage its operations; minimum staffing permissive, not mandatory, subject of negotiation). Moreover, once a staffing provision becomes part of a collective bargaining agreement and is approved by the local legislative body (G. L. c. 150E, § 7 [*b*]), it is enforceable for only one fiscal year. *Billerica, supra.* Cf. G. L. c. 150E, § 6 (listing mandatory subjects of collective bargaining); *Boston Teachers Union, Local 66* v. *School Comm. of Boston, supra* at

---

[4]We acknowledge all the arguments made by the parties, but we need not address those arguments unnecessary to this decision.

203-209 (salary increases are enforceable in multi-year collective bargaining agreement).

In the *Billerica* case, the court concluded that an arbitrator exceeded his authority when he ordered the town to fund its fire fighters' staffing provision for a second year without the town's legislative body first appropriating necessary funds. *Id.* at 693, 696. The court held that, without the town's agreement to fund a second year, the arbitrator's order infringed on the town's managerial prerogative to determine staffing levels. *Id.* at 694-695, citing *Boston Teachers Union, Local 66* v. *School Comm. of Boston, supra* at 200-201, 213 (no lay-off clause in teachers' collective bargaining agreement). See also *Billerica, supra* at 695, citing *Saugus* v. *Newbury*, 15 Mass. App. Ct. 611, 614-615 (1983) (fire fighters' job security provision not enforceable against town in second year where town meeting declined to appropriate funds).[5]

However, the court also held that "*the law* [G. L. c. 150E, § 7 (*b*)] *required* that a request for an appropriation necessary to fund the agreement for its second year be presented to the town meeting for action" (emphasis added). *Billerica, supra* at 696. As noted above, the court stated that the union's remedy was to seek a court order against the town administrator. *Id.*

Once town officials submit a request for appropriation, however, a town meeting has no obligation to fund it. *Saugus* v. *Newbury, supra* at 614-615. *County of Suffolk* v. *Labor Relations Comm'n*, 15 Mass. App. Ct. 127, 130-133 (1983) (Labor Relations commission does not have power to order funding of collective bargaining agreement; legislative body must appropriate). Cf. *Labor Relations Comm'n* v. *Selectmen of Dracut*, 374 Mass. 619, 627-629 (1978) (once funds for collective bargaining agreement are appropriated, future town meeting may not rescind them).

---

[5]Even though a municipality has the right to determine its staffing levels, it may be required to negotiate the impact of those decisions as a term and condition of employment under G. L. c. 150E, § 6. See *Burlington* v. *Labor Relations Comm'n*, 390 Mass. 157, 166-167 (1983) (decision to assign prosecutorial duties); *School Comm. of Newton* v. *Labor Relations Comm'n*, 388 Mass. 557, 562-564 (1983) (decision to reduce level of janitorial services). See generally *Worcester* v. *Labor Relations Comm'n*, 438 Mass. 177, 185 (2002) (decision to enforce school attendance laws).

442 Mass. 463 (2004)                                      469

Local 1652, International Association of Firefighters v. Town of Framingham.

The town argues that its contingent budget was proper even under the holding in the *Billerica* case because, whereas Billerica town officials failed to submit any funding request, the town did submit a funding request (albeit with some of the funding to come from an override). We reject the town's attempt to confine the holding in the *Billerica* case to its facts, because nowhere in the plain language of the statute does it indicate that a contingent request is allowed. Rather, § 7 (*b*) states that the employer "shall submit to the appropriate legislative body . . . a request for an appropriation necessary to fund the cost items contained therein." Moreover, our conclusion is supported by a number of other cases, in addition to the *Billerica* case. See e.g., *Town of Belmont*, 22 M.L.C. 1636, 1639-1640, 1641 (1996) (two selectmen who signed collective bargaining agreement, but spoke against minimum staffing provision in capacity as town meeting members, violated obligation under G. L. c. 150E, § 7 [*b*], to support the provision before town meeting); *City of Chelsea*, 13 M.L.C. 1144, 1150-1151 (1986) (where agreement had staffing provision, holding parties to "totality of their bargain promotes more stable and predictable labor relations"); *Local 1032, IAFF*, 9 M.L.C. 1792, 1796 (1983) (bad faith where city manager refused to submit funding for fire department's staffing provision); *City of Medford*, IAFF, 6 M.L.C. 2129, 2130-2131 (1980) (where statute allows city council to vote to override tax cap, city manager cannot refuse to submit budget for full funding of provision to fill vacancies in fire department); *Town of Kingston*, 6 M.L.C. 1388, 1389 (1979) (ordering town officials to support warrant to fund career incentive clause in collective bargaining agreement at town meeting; insufficient funds not an excuse where the provision allowed options besides direct appropriation).[6] But see *Labor Relations Comm'n* v. *Selectmen of Dracut*, 374 Mass. 619, 623,

---

[6]Cases concerning funding for wages, a mandatory subject of bargaining pursuant to G. L. c. 150E, § 6, also have held that the obligation of municipal officials to seek funding is unconditional. See, e.g., *County of Suffolk* v. *Labor Relations Comm'n*, 15 Mass. App. Ct. 127, 129, 133 (1983) (where mayor failed to request appropriation from city council for wage increases in collective bargaining agreement, only remedy is order compelling him to do so); *Mendes* v. *Taunton*, 366 Mass. 109, 118 (1974) (mayor obligated to request funds for wage increases); *Town of Rockland*, 16 M.L.C. 1001, 1005 (1989) (selectmen's failure to speak in favor of provision to upgrade salaries of

625-626 (1978) (commission cannot force successor public officials to support a collective bargaining agreement negotiated by predecessors; court took no position regarding validity of commission's order that selectmen take steps necessary to fund collective bargaining agreement).

Given the plain language of G. L. c. 150E, § 7 (*b*), and this case history, we conclude that the town was required to submit a budget that unconditionally and fully funded the staffing provision.[7] For the same reasons, we also reject the town's argument that it satisfied its statutory obligation to submit a request to fund fully the staffing provision by its express reminder to the town meeting members that they could "make the appropriate motion" to fund the staffing provision fully.

We now address our conclusion that G. L. c. 59, § 21C, enacted after G. L. c. 150E, has no impact on the town officials' obligation to submit an unconditional funding request.[8]

___

librarians violates unconditional obligation to seek funding); *Worcester Sch. Comm.*, 5 M.L.C. 1080, 1081, 1082-1083 (1978) (school committed required to give "affirmative support for an appropriation" for secretaries' salaries); *Turners Falls Fire Dist.*, 4 M.L.C. 1658, 1660, 1662 (1977) (at district meeting, town officials' failure to speak against motion to delete money for fire fighters' salaries contained in collective bargaining agreement violated duty to take affirmative steps to support terms of such agreement before legislative body). See generally *Town of Swampscott*, 2 M.L.C. 1531, 1532 (1976), and cases cited ("a public employer is obligated to submit to the appropriate legislative body a request for any funds necessary to implement a collective bargaining agreement").

[7]We need not address the town's argument that the standard of review for whether it violated G. L. c. 150E, § 7 (*b*), is good faith "given the [t]own's fiscal restraints." We note, however, that the cases on which the town relies, most of which are addressed elsewhere in this opinion, are not apt.

We also decline to address the town's argument that a fully funded budget request would have put it in a position of either making further cuts in other departments or forcing it to create new fees to meet its obligations in a fiscally responsible manner. We note that these issues are considered by town officials as part of the process of negotiating a collective bargaining agreement. In addition, under the town's bylaws, a finance committee is charged with making recommendations to the town meeting concerning financial matters, and did so in this case.

[8]Even if we were to conclude (which, as discussed *infra*, we do not), that G. L. c. 59, § 21C, impacted, in some way, town officials' obligations under G. L. c. 150E, § 7 (*b*), we would not be persuaded that the town could meet its statutory obligations by submitting a contingent budget. The town admits that its contingent budget added several steps before town officials could be

2. *Impact of G. L. c. 59, § 21C, on the town officials' obligation under G. L. c. 150E, § 7 (b).*

General Laws, c. 59, § 21C, popularly known as Proposition 2 ½, was enacted in 1980. St. 1980, c. 580, § 1, as amended. General Laws, c. 59, § 21C (*a*), states, in relevant part: "Whenever used in the text of this section, the following words and terms shall have the following meanings: . . . '[l]ocal appropriating authority', in a town, the board of selectmen . . . ." The statute uses the words "local appropriating authority" several times. See, e.g., G. L. c. 59, § 21C, pars. (*e*), (*g*), (*h*), (*i*), (*i* ½), (*j*), (*k*), (*n*). However, G. L. c. 59, § 21C (*m*), which enumerates sources of appropriations available to a town, does not use the words "local appropriating authority."[9] Instead par. (*m*) states, in pertinent part:

"A *town* may appropriate from the tax levy, from available funds, or from borrowing, contingent on the passage of a ballot question under paragraph (*g*), (*i* ½) or (*k*), but . . . no election at which the question appears on the ballot shall take place later than September 15. following the

considered to have submitted an unconditional request for full funding. Each step has an uncertain outcome (i.e., town meeting had to approve the contingent budget, then town officials had to vote to place an override on the ballot, which would then be submitted to the vagaries of a ballot referendum). Proposing such an uncertain budget process over which neither town officials nor the town meeting has ultimate control could not be reconciled with the unconditional support for the staffing provision required by the plain language of G. L. c. 150E, § 7 (*b*), and the relevant case law. Nor does it appear that a contingent budget would satisfy even the plain language of G. L. c. 59, § 21C (*m*) (discussed *supra*), which gives the town, not the voters, the authority to appropriate money contingent on an override. See generally *Springfield Hous. Auth.* v. *Labor Relations Comm'n*, 16 Mass. App. Ct. 653, 656-659 (1983) (unlawful for a party to collective bargaining agreement to submit agreement to a third party for approval, unless that contingency was part of negotiations); *Boston Teachers Union, Local 66* v. *Boston*, 382 Mass. 553, 565 (1981), quoting *Keane* v. *City Auditor of Boston*, 380 Mass. 201, 209 (1980) ("we cast a cold eye on rules that would multiply the number of entities involved in the collective bargaining process").

[9]In her decision, the judge stated that "M. G. L. c. 59, § 21C (*m*), addresses the 'appropriating authority' i.e., the legislative branch." However, the judge's use of the words "appropriating authority" did not come from the text of par. (*m*). In this opinion, we use the specific language in the statute and we decline to address any arguments made by the town that depend on accepting the judge's phraseology.

date of an appropriation vote adopted at an annual town meeting, or 90 days after the date of the close of any other town meeting at which an appropriation vote was adopted" (emphasis added).[10]

3. *Impact of G. L. c. 59, § 21C, on town's obligations under G. L. c. 150E, § 7 (b).*

The town submitted the contingent budget to the town meeting pursuant to G. L. c. 59, § 21C (*m*). The town admits that par. (*m*) gives the town meeting, not town officials, the power to make *appropriations* contingent on an override. Paragraph (*m*) also enumerates the paragraphs under which a ballot question may be brought to voters so that the contingent appropriation could be funded. The ballot question would be proposed by the "local appropriating authority" (i.e., town officials) pursuant to those enumerated paragraphs. See note 10, *supra.* As the town points out, in this case, town officials would have proposed an override pursuant to par. (*g*). The plain language of par. (*m*) does not address contingent budgets proposed by town officials in any way.

Nevertheless, the town asserts, in essence, that G. L. c. 59, § 21C (*m*), changes its obligations under G. L. c. 150E, § 7 (*b*). It does not point to any language anywhere in the override statute that grants town officials the authority to submit a budget contingent on an override. Instead, it argues that the town's registered voters and the town meeting jointly make up the legislative body of the town and, therefore, the two would "make the funding decision" jointly through an override. The town points to *Town of Swampscott,* 2 M.L.C. 1531, 1532 (1976), arguing that the case "reinforces the role of the electorate's power to make the ultimate determination with respect to appropriations." In the *Swampscott* case, the town meeting appropriated funds to implement a collective bargain-

---

[10]The provisions cited in this section, i.e., pars. (*g*), (*i* 1/2), and (*k*), authorize the "local appropriating authority" to vote to put a Proposition 2 1/2 override on the ballot, and specifies the form the question should take.

Moreover, we note that under the paragraphs mentioned in G. L. c. 59, § 21C (*m*), only par. (*g*), allows for a simple majority vote by both the local appropriating authority and the voters. The other provisions require a two-thirds majority vote.

442 Mass. 463 (2004)                                    473

Local 1652, International Association of Firefighters *v.* Town of Framingham.

ing agreement with the police department. In what the Labor Relations Commission (commission) called "an unfortunate disregard for the spirit if not the letter of [G. L. c. 150E]," members of school committee petitioned under G. L. c. 43A, § 10, to put the funding decision before the voters, who overturned it. Because the school committee was not the employer under G. L. c. 150E, the school committee's "unwonted interference with the orderly process of a collective bargaining" could not be held against the town. Thus, the commission was precluded from granting the union's request for a complaint against the town. *Id.* at 1531. However, the commission, citing town officials' obligation to submit a request for full funding of a collective bargaining agreement, "strongly suggest[ed]" that the town officials resubmit and actively support the funding warrant at the next town meeting. *Id.* at 1532.

This case does not help the town because it did not involve either the override statute, which was enacted after the case was decided, or a situation where town meeting members, at the request of town officials, partially funded a staffing provision and left it to the voters to determine whether there would be full funding of a collective bargaining agreement.[11] Moreover, the strong language used by the commission in objecting to what the school committee did underscores the principle that town officials must continue to support funding of a collective bargaining agreement even where voters have expressed their desire not to fund it. See *id.* at 1531 ("These [school] committees have, in too many instances, failed to realize that the old order has changed, and that [G. L. c. 150E] has mandated a new approach to personnel matters").[12]

The town also argues that cases interpreting G. L. c. 150E,

---

[11]We also note that G. L. c. 43A, § 10, the statute employed in *Town of Swampscott*, 2 M.L.C. 1531 (1976), allows voters to override a town meeting's authorization of specific kinds of expenditures, including "expenditure of twenty thousand dollars or more as a special appropriation." See *Camacho* v. *Selectmen of Stoughton*, 27 Mass. App. Ct. 178, 182 n.6, 183 (1989). It is not clear from the facts in the *Swampscott* case under what provision of the statute the appropriation fell. Nor does the town address the differences between the statute and the override statute.

[12]The other cases the town offers in support of its argument concerning the involvement of the electorate in the budget process also are not apt. In *National Ass'n of Gov't Employees, Local R1-162* v. *Labor Relations Comm'n*, 17

§ 7 (*b*), have allowed towns to use alternative sources of funding for collective bargaining agreements and, therefore, they properly used the override statute for such purpose. We agree with the union that the cases on which the town relies are inapposite because they do not involve a source of funding outside of a direct request by a public employer to a legislative body for full funding of a contractual agreement. The town relies on *City of Medford*, 6 M.L.C. 2129 (1980). In that case, the city manager refused to submit a full funding request of a collective bargaining agreement claiming that to do so would exceed a mandatory tax cap pursuant to St. 1979, c. 151. *Id.* at 2130. However, part of the statute allowed the city council itself to vote to override the tax cap. *Id.* at 2131. The commission held that the city manager had violated G. L. c. 150E, by refusing to submit a request for full funding and precluded the city council from exercising their specific statutory authority. It is important to note that the existence of a tax cap statute did not affect the city manager's obligation under the statute to request full funding.

Regarding the other cases cited by the town, it is true that the commission stated that it would not dictate the specific method of full funding that must be requested of the legislative body. Nevertheless, in each case, the commission reiterated the principle that the "employer" is obligated to submit a full funding request to the legislative body. See *Town of Rockland*, 16

Mass. App. Ct. 542, 542 (1984) the school committee caused a referendum to be placed on the ballot "which, if affirmed, would rescind the town's acceptance of civil service coverage for certain future employees of the town." The union claimed that the town had an obligation to negotiate over the impact of the referendum, which the voters approved. *Id.* at 543. The court held that town officials did not have to bargain over the impact of the referendum because, although the civil service statute affected terms and conditions of employment, it was not listed in G. L. c. 150E, § 7 (*d*) (discussed *infra*), as a statute that was superseded by a collective bargaining agreement. *Id.* at 545. The civil service statute is a local option law, which, unlike the "extremely limited role [the local legislative body has] in the process of determining terms and conditions of employment of public employees . . . afford[s] the municipality significant opportunities to affect directly the terms and conditions of public employment." *Id.* at 545-546. See *Commonwealth of Mass.*, 19 M.L.C. 1134, 1136, 1138 (1992) (bill before Legislature concerning criteria for appointments and promotions did not conflict with the collective bargaining agreement, therefore, Commonwealth's support of bill was not a violation of duty to bargain in good faith).

442 Mass. 463 (2004)                                     475

Local 1652, International Association of Firefighters *v.* Town of Framingham.

M.L.C. 1001, 1005 (1989); *City of Medford,* 9 M.L.C. 1792, 1795-1796 (1983). In fact, in *Worcester Sch. Comm.,* 5 M.L.C. 1080, 1084 (1978), the commission found that the school committee violated the statute's requirement to bargain in good faith where it proposed funding a contract by a method it knew would fail (i.e., through a supplemental appropriation presented to the city council). The school committee was obligated to seek other funding methods.[13]

The town argues, in essence, that the override statute may be used to fund a staffing provision because it is not among the statutes listed in G. L. c. 150E, § 7 (*d*), as being superseded by provisions of a collective bargaining agreement. This argument also lacks merit.

General Laws c. 150E, § 7 (*d*), states, in pertinent part:

> "If a collective bargaining agreement reached by the employer and [union] contains a conflict between matters which are within the scope of negotiations *pursuant to section six of this chapter and any municipal personnel ordinance, by-law, rule or regulation* [list of regulations and statutes omitted] the terms of the collective bargaining agreement shall prevail" (emphasis added).

The plain language of G. L. c. 150E, § 7 (*d*), is not ambiguous. Therefore, "it must be interpreted according to its usual and natural meaning." *Boston Teachers Union, Local 66* v. *Boston,* 382 Mass. 553, 561 (1981). General Laws c. 150E, § 7 (*d*), covers "conflict[s]" between terms in collective bargaining agreements negotiated pursuant to G. L. c. 150E, § 6 (i.e., terms and conditions of employment, the subject of

---

[13]We do not agree with the town that this holding supports the validity of its submission of the contingent budget, if for no other reason than there was no evidence that the town knew another method of funding would be rejected by the town meeting (in any event subsequent events proved that the town meeting would accept another method).

Moreover, the town's argument that the supplemental budget proposed in *Worcester Sch. Comm.,* 5 M.L.C. 1080, 1084 (1978), is analogous to its contingent budget, misapprehends the facts in the *Worcester* case. There, the supplemental budget was proposed, not because the school committee proposed less than full funding of a collective bargaining agreement, but because the collective bargaining agreement was reached after the city's regular budget process, and the agreement had to be funded. *Id.* at 1081-1082.

mandatory bargaining)[14] and municipal *personnel* ordinances, bylaws, rules, or regulations.

Where a conflict has existed between the terms of a collective bargaining agreement and a statute concerning terms and conditions of employment, the statute has prevailed. See *School Comm. of Natick* v. *Education Ass'n of Natick*, 423 Mass. 34, 39 (1996) (statute concerning authority to appoint school coach, not listed in § 7 [*d*], supersedes collective bargaining agreement); *National Ass'n of Gov't Employees, Local R1-162* v. *Labor Relations Comm'n*, 17 Mass. App. Ct. 542, 544 (1984) (no duty to bargain over matters covered by civil service statute accepted by town; if "statute specifically *mandating certain terms and conditions of employment* is not listed in § 7 [*d*], the statute cannot be super[s]eded by a bargaining agreement" [emphasis added]); *School Comm. of Holyoke* v. *Duprey*, 8 Mass. App. Ct. 58, 63-64 (1979) (where city never accepted statute concerning employee contribution to insurance premiums and statute not listed in § 7 [*d*], terms of collective bargaining agreement are unenforceable). See also *Town of Danvers*, 3 M.L.C. 1559, 1572 (1977) ("[§] 7 by its very language poses a dual test . . . a matter must be . . . within the scope of [§] 6 [and] it must be determined whether there is a conflict between that matter and the enumeration of [§] 7"); *Labor Relations Comm'n* v. *Natick*, 369 Mass. 431, 441-442 (1976) (discussing nature of the various statutes listed in § 7 [*d*]); *Burlington* v. *Labor Relations Comm'n*, 390 Mass. 157, 159-167 (1983) (where tradition and statutes establish that district attorneys have prosecutorial duties, no violation of G. L. c. 150E to relieve police prosecutors of duty, but impact of decision must be negotiated with union).

However, by its plain language, G. L. c. 150E, § 7 (*d*), limits the scope of statutes that may supersede terms of a collective bargaining agreement to those concerning terms and conditions

---

[14]General Laws c. 150E, § 6, states, in pertinent part:

"The employer and the exclusive representative . . . shall negotiate in good faith with respect to wages, hours, standards or productivity and performance, and any other terms and conditions of employment . . . ."

See also discussion at note 5, *supra.*

of employment. Because the override statute does not concern a term and condition of employment, there is no "conflict" between it and the collective bargaining agreement within the meaning of § 7 (*d*).[15] Instead, the town faced a situation that all municipalities may face, a budget shortfall and the existence of contractual obligations that need to be funded. See *Mendes* v. *Taunton*, 366 Mass. 109, 113-114 (1974) (where collective bargaining agreement's salary provision not in direct conflict with plain language of municipal finance laws court will not endorse construction that would "render virtually ineffective" provision in law allowing three-year collective bargaining agreements).

The plain language of par. (*m*) does not authorize town officials to submit a budget contingent on an override. There is no merit in any of the arguments advanced by the town to the effect that the override statute nevertheless changes the obligation of town officials to submit a proposal for full funding of the staffing provision under G. L. c. 150E, § 7 (*b*). Moreover, as it is, the town meeting does not have to fund a staffing proposal, and is allowed to make contingent appropriations under par. (*m*). From a public policy perspective, the town's interpretation

---

[15]Assuming, arguendo, that there was a conflict within the meaning of G. L. c. 150E, § 7 (*d*), it does not mean that the collective bargaining agreement must yield to the statute. Cases concerning statutes covering even terms and conditions of employment that are absent from § 7 (*d*) have focused not on whether they are absent from the list contained in § 7 (*d*), but on whether a material conflict exists between the statute and the collective bargaining agreement. *Dedham* v. *Dedham Police Ass'n (Lieutenants & Sergeants)*, 46 Mass. App. Ct. 418, 420-421 (1999) (although civil service statute not listed in § 7 [*d*], provision in collective bargaining agreement concerning preferences for vacations and shift assignments controls where no conflict exists); *Rooney* v. *Yarmouth*, 410 Mass. 485, 493-494 n. 4 (1991) (although career incentive pay program statute is not listed in § 7 [*d*], no conflict between statute and collective bargaining agreement). But see *Leominster* v. *International Bhd. of Police Officers, Local 338*, 33 Mass. App. Ct. 121, 124-125 (1992), and cases cited (where direct and material conflict with civil service statute that is not listed in § 7 [*d*], collective bargaining agreement yields to statute). See *School Comm. of Newton* v. *Labor Relations Comm'n*, 388 Mass. 557, 565-567 & n.6 (1983) (§ 7 [*d*] concerns specific mandates regarding terms and conditions of employment; school committee must bargain concerning decision to achieve reduction in janitorial services by layoffs where authority in city charter to layoff, and where city charter is not an "ordinance, rule, or regulation").

of G. L. c. 59, § 21C, would "render virtually ineffective" the collective bargaining statute, *Mendes* v. *Taunton*, *supra* at 113-114, because it would allow town officials to negotiate an agreement without any obligation to present it, as negotiated, for a vote by the town meeting. See note 8, *supra*.

*Conclusion.* A declaratory judgment shall enter that town officials may not fulfil their obligation under G. L. c. 150E, § 7 (*b*), by submitting a budget that makes full funding of a staffing provision contained in a multiyear collective bargaining agreement contingent on town voters approving a potential property tax override pursuant to G. L. c. 59, § 21C.

*So ordered.*

SOSMAN, J. (dissenting, with whom Marshall, C.J., and Cordy, J., join). The sole issue before us is whether the town manager and the board of selectmen of Framingham submitted to "the appropriate legislative body . . . a request for an appropriation necessary to fund the cost items" of the town's collective bargaining agreement with the plaintiff union. G. L. c. 150E, § 7 (*b*). It is undisputed that they submitted "a request for an appropriation" to the town meeting, and undisputed that the requested budget included an amount sufficient to cover all of the provisions in the collective bargaining agreement. The court today concludes that that "request for an appropriation necessary to fund the cost items" of the agreement fails to satisfy G. L. c. 150E, § 7 (*b*), because it was submitted pursuant to G. L. c. 59, § 21C (*m*), which allows a town to "appropriate from the tax levy, from available funds, or from borrowing, contingent on the passage of a ballot question" under what is popularly referred to as "Proposition 2 ½." Nothing in G. L. c. 150E, § 7 (*b*), places any restriction on what form the requested "appropriation" must take, and there is no reason to believe that the term "appropriation" would not include an "appropriation" made pursuant to G. L. c. 59, § 21C (*m*). The identical term, a well-recognized term of art in government finance, is used in both statutes, and we should not give that technical term different meanings in the two statutes.

The court today reads into G. L. c. 150E, § 7 (*b*), a require-
ment that there be nothing "conditional" or "contingent" about
the appropriation request and, therefore, that the contingencies
associated with voter approval of a Proposition 2 ½ override
mean that a request for an "appropriation" under G. L. c. 59,
§ 21C (*m*), cannot satisfy the town employer's obligation under
G. L. c. 150E, § 7 (*b*). The statute contains no such requirement.
Inherent in any appropriation request submitted to "the ap-
propriate legislative body" under § 7 (*b*) is the risk that that
"legislative body" may refuse the request, and there is nothing
that an employer can do to couch "a request for an appropria-
tion" in a manner that eliminates the condition that the request
be approved. Indeed, the statute itself recognizes that distinct
possibility: "If the appropriate legislative body duly rejects the
request for an appropriation necessary to fund the cost items [of
the collective bargaining agreement], such cost items shall be
returned to the parties for further bargaining." G. L. c. 150E,
§ 7 (*b*). See *Saugus* v. *Newbury*, 15 Mass. App. Ct. 611 (1983)
(when town meeting rejected selectmen's request for appropria-
tion to fund second year of agreed minimum staffing provision,
provision became unenforceable). See also *Boston Teachers
Union, Local 66* v. *Boston*, 382 Mass. 553, 560 (1981) (§ 7 [*b*]
required mayor to submit appropriation request to city council,
but "[city] council may appropriate the necessary funds or may
reject the request"); *Mendes* v. *Taunton*, 366 Mass. 109, 118-
119 (1974) (same under predecessor statute).

While there is no requirement that the appropriation request
somehow be made in a manner that avoids any contingency
about its approval (as such a requirement would be a legal
impossibility), what *has* emerged in the jurisprudence surround-
ing § 7 (*b*) is the requirement that the government employer
submitting the request affirmatively support that request and af-
firmatively strive to get it approved. The town officials may not
shirk their obligations by failing to submit any request (see
*Billerica* v. *International Ass'n of Firefighters, Local 1495*, 415
Mass. 692, 696 [1993]), nor may they speak out against full
funding for the provisions in the collective bargaining agree-
ment (see *Town of Belmont*, 22 M.L.C. 1636, 1639-1641

[1996]), or keep silent while others speak against the funding measure (see *Turners Falls Fire Dist.*, 4 M.L.C. 1658, 1660, 1662 [1977]), or remain passive while the legislative body considers it (see *Town of Rockland*, 16 M.L.C. 1001, 1005 [1989]). In short, their obligation extends beyond a mere token or ministerial submission of a request for an appropriation to fund a collective bargaining agreement, but encompasses an obligation to work affirmatively toward getting that request approved. Again, however, nothing in that obligation requires (or even enables) the employer to eliminate the unavoidable risk that the appropriation request might be rejected by the legislative body to which it was submitted. The requirement that town officials support and pursue their own request for appropriations to fund collective bargaining agreements cannot translate to the impossible requirement that approval of that request be somehow certain, or "unconditional."

Subsequent to the enactment of G. L. c. 150E, § 7 (*b*), the voters enacted G. L. c. 59, § 21C. See St. 1980, c. 580, § 1. Section 21C now imposes limitations and requirements on municipal finance that did not exist previously, and a municipality's ability to fund its collective bargaining agreements is unavoidably subject to the constraints of that statute. Specifically, cities and towns may not assess taxes in excess of two and one-half per cent of the valuation of all real estate and personal property located within their boundaries, and the assessed taxes for any given year may not exceed 102 ½% of the prior year's levy limit (absent certain exceptions). G. L. c. 59, § 21C (*b*), (*f*). However, if a city or town wishes to assess taxes in amounts above those limits, it may do so by submitting a question to the voters and obtaining a majority vote in favor of that higher assessment. G. L. c. 59, § 21C (*g*), (*i½*), (*j*), (*k*).

Of importance to the present case is § 21C (*m*), which allows a "town" to make an "appropriation" contingent on voter approval of assessments in excess of the otherwise applicable limits. The town "may appropriate from the tax levy, from available funds, or from borrowing, contingent on the passage of a ballot question," but "the appropriation vote shall not be deemed to take effect until the approval of the ballot

question."[1] § 21C (*m*). In other words, as here, a town may approve a budget that is premised on the passage of an override, and thereby make "appropriations," but the required steps of an election and voter approval must be completed before those "appropriations" are effective. Notwithstanding the complexity of those steps, and notwithstanding whatever uncertainty there may be about their successful completion at the time the process is initiated, the result is a lawful "appropriation" of funds for the stated purpose. A request for an "appropriation" under § 21C (*m*) is simply one form of requesting an "appropriation," and the fact that final approval of such an "appropriation" request involves approval by both the town meeting and the voters themselves does not make it any less an "appropriation."

Here, the town of Framingham has a representative town meeting, with twelve town meeting members from each of eighteen precincts. For purposes of making "appropriations," the town meeting is the "town." See G. L. c. 40, § 5 ("town may at any town meeting appropriate money for the exercise of any of its corporate powers"). Thus, the provision in G. L. c. 59, § 21C (*m*), allowing a "town" to make appropriations contingent on voter approval of an override, refers to appropriations made at town meeting. The town meeting is also a "legislative body" for purposes of requests for appropriations to fund collective bargaining agreements under G. L. c. 150E. See G. L. c. 150E, § 1 (defining "[l]egislative body" as "the city council or town meeting in the case of a city, town or district").

There is some suggestion in today's opinion that this form of appropriation request would not satisfy G. L. c. 150E, § 7 (*b*), because the voters are not a "legislative body," and because the board of selectmen (also not a "legislative body") is the branch of town government that must place an override question before the voters. G. L. c. 59, § 21C (*a*), (*g*). This terminology is no ground for concern. In the first place, it is the town meeting

---

[1]The statute also requires that the purpose of the appropriation be "substantially the same" as the purpose identified on the ballot question, that the election on the question take place within certain time periods, and that the town's tax rate not be submitted for certification until after the election is held. G. L. c. 59, § 21C (*m*).

that makes the "appropriation" under G. L. c. 59, § 21C (*m*): when the board of selectmen and town manager submitted the requested budget to the town meeting and asked its members to approve it, they were submitting that request for an "appropriation" to the "appropriate legislative body." G. L. c. 150E, § 7 (*b*). The voters do not make the "appropriation," but instead approve the increased assessment that makes the "appropriation" legally effective. More importantly, to the extent that § 21C (*m*) pragmatically means that the voters must approve the "appropriation," even the voters would come within the definition of "legislative body" for purposes of G. L. c. 150E: the definition of "[l]egislative body" includes not only the "town meeting," but also "any body which has the power of appropriation with respect to any employer." G. L. c. 150E, § 1. Thus, to the extent that the voters are part of the "appropriation" process for an appropriation under § 21C (*m*), they comprise a "legislative body" for purposes of G. L. c. 150E.

With regard to the submission of an override question to the voters, it is the board of selectmen that has the authority to submit such a question. See G. L. c. 59, § 21C (*a*), (*g*).[2] Here, the board of selectmen and the town manager submitted the appropriation request to the town meeting (the body that had the power to make an "appropriation"), and the board of selectmen submitted a ballot question for the voters to decide. Concerns that the town meeting itself could not submit the question to the voters poses no obstacle under G. L. c. 150E, § 7 (*b*). The well-established requirement that the employer affirmatively support its own request for appropriation would require the board of selectmen to proceed with the ballot question necessary to make the "appropriation" effective.

There is no suggestion on this record that the board of select-

[2]The terminology is somewhat confusing, because § 21C places this power in the hands of the "local appropriating authority" (see § 21C [*g*], [*l½*], [*j*], [*k*]), but then, for purposes of a "town," defines "[l]ocal appropriating authority" as "the board of selectmen" (see § 21C [*a*]). The board of selectmen has no power to make appropriations, and calling it an "appropriating authority" is an odd nomenclature. For cities, and for municipalities with a town council form of government, the "local appropriating authority" is the city council or town council, *id.*, a body that does have the power of appropriation.

men harbored any secret intention to obtain town meeting approval of the budget they recommended and then sabotage that same budget by failing to submit a ballot question to the voters.[3] Indeed, the town manager and the board of selectmen were unabashed in their "pitch" to the town meeting about their recommendation of the budget and its accompanying override vote. There is no doubt about the sincerity or the enthusiastic effort that they put forth to use this funding mechanism to obtain full funding for the collective bargaining agreement and, along with it, the needs of other town departments. Nor can their good faith efforts be assailed as so unrealistic, or so dubious of success, as to not constitute a legitimate "request for an appropriation." The override question was ultimately submitted to the voters, and it passed, even without the added urgency it would have had had the staffing requirements for an essential service like the fire department been part of the override and had the union added its endorsement to the override campaign.

Ignoring the fact that what was submitted to the town meeting was a budget request including an amount for full funding of the minimum staffing requirement, the union protested that the companion "balanced budget" did not contain that full funding. That "balanced budget" was *not* the budget that the town manager and the board of selectmen requested — instead, they submitted that alternative budget to demonstrate what the budget would look like (and what drastic reductions in all town departments and programs would ensue) without the requested override. At no point did they indicate to the town meeting that that was the budget they wanted the town meeting to approve. Instead, they were unambiguous in their request that the town meeting approve the budget that included full funding of the fire fighters minimum staffing, and made clear their commitment to seek the voter approval that would make that appropriation effective.

In today's fiscal climate, Proposition 2 ½ override votes are a regular component of municipal finance. Whereas a munici-

---

[3]Nor can there be any concern that the selectmen first sought town meeting approval of that budget before submitting the ballot question to the voters — if the town meeting would not approve the budget, there would be no point in obtaining the override.

pality's prerogative to decide such policy questions as funding for minimum staffing used to reside solely in the elected representatives comprising the municipality's legislative branch, Proposition 2 ½ now sometimes places that prerogative directly in the hands of the voters themselves. Rather than seek to harmonize G. L. c. 150E, § 7 (*b*), with G. L. c. 59, § 21C, today's decision seeks to exclude collective bargaining agreements from this modern form of municipal budgeting. I believe the two statutes can readily be harmonized, and I see no reason why full funding for collective bargaining agreements cannot be sought using the mechanism of a Proposition 2 ½ override. If city and town officials may not use that mechanism to meet their obligations under G. L. c. 150E, § 7 (*b*), their ability to afford such items as minimum staffing will be reduced, and their willingness to agree to such cost items in collective bargaining agreements must correspondingly diminish. I see nothing in G. L. c. 150E, § 7 (*b*), or in the jurisprudence surrounding the obligation that it imposes, that would compel that unfortunate result. I therefore respectfully dissent.