Lu, John T., J.
Introduction
The plaintiff, Local 762, International Association of Firefighters, AFL-CIO (Union), seeks a preliminary injunction against the defendants, Carolyn Kirk as she is the Mayor of the City of Gloucester (Mayor) and the Cily of Gloucester (City), compelling the Mayor to submit an appropriations request, sufficient to fund alleged contractual minimum-staffing obligations for Fiscal Year 2010 (FY2010), to the City Council of Gloucester (City Council). Concluding that the Union has demonstrated a substantial likelihood of success as the contract requires funding for 18 employees on duty at the start of each shift, that despite the arbitration provision there will be irreparable harm to the Union if relief is not granted and that the risk of harm to the Union outweighs the harm to the city and, finally, that the requested relief will not adversely affect the public interest, the court orders the Mayor to submit an appropriations request sufficient to fund the minimum staffing level of eighteen firefighters at the start of each shift.
Discussion
In determining whether to grant a preliminary injunction, the court evaluates “the moving party’s claim of injury and its chance of success on the merits.” Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). If failure to issue the injunction would “subject the moving party to substantial risk of irreparable harm,” the court “must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. If the moving party seeks to enjoin government action, the requested injunction must promote the public interest or not adversely affect the public interest. Tri-Nel Mgmt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001).
The parties executed a collective bargaining agreement (agreement) on March 24, 2006, which covered the period from July 1, 2004 through June 30, 2007. Although the Union and City have not executed a new agreement since June 30, 2007, both parties agree that the agreement contains an “evergreen” clause continuing its terms until a new contract is reached.[3]
A. Substantial Likelihood of Success on the Merits
The first consideration is whether the Union has a substantial likelihood of success on the merits of its claim. To demonstrate a likelihood of success, the Union must prove that 1) the agreement requires that eighteen firefighters be on duly at the start of every shift; and 2) that the agreement obligates the Mayor *473 to submit a request to the City Council adequate to fund the staffing of eighteen firefighters.
The provision at issue is found in Paragraph 4(G) of the agreement. It provides that:
The staffing of Ladder #2 per shift will be five employees: one ladder driver, two members which will staff Rescue #1, and two of which will staff Rescue #2 on an available as needed basis. In the event 18 men are on duty, Ladder #2 will be staffed with six employees. Subject to funding, as of June 30, 2007, there shall be no less than 18 employees on duly at the start of each shift. A copy of the staffing plan is attached for reference herein in Appendix A.
The Union maintains that Paragraph 4(G) requires a minimum staffing level of eighteen firefighters on duty at the start of each shift. The City interprets Paragraph 4(G), read in conjunction with other provisions in the agreement, to require only that eighteen firefighters be scheduled at the start of each shift.[4]
“Justice, common sense, and probable intention of the parties are guides to the construction of a written instrument.” Matthews v. Planning Bd. of Brewster, 72 Mass.App.Ct. 456, 462 (2008) (quotation omitted). When words in a contract are clear and consistent with other terms of the contract, they are to “be construed in their usual and ordinary sense.” Id., quoting General Convention of the New Jerusalem in the U.S., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007). The provision in Paragraph 4(G) (the provision) requires that there shall be not less than 18 employees on duty at the start of each shift (emphasis added). The plain meaning of shall contemplates a mandatory or imperative obligation. Hashimi v. Kahil, 388 Mass. 607, 610 (1983) (citations omitted); Black’s Law Dictionary 1379 (7th ed. 1999) (defining shall as “has a duiy to; more broadly, is required to”). A common sense interpretation of the phrase on duty implies that a firefighter is actually working, or in other words, “actually engaged in work or services undertaken for another . . .” Ballentine’s Law Dictionary 887 (3d ed. 1969) (defining on duty). Attributing usual and ordinary meanings to the words in the provision, it mandates that eighteen firefighters report to work for the start of each shift. See Local 1652, Int’l Ass’n of Firefighters v. Town of Framingham, 442 Mass. 463, 465 (2004) (undisputed that provision in collective bargaining agreement requiring minimum number of firefighters be on duty at any time was a minimum-staffing level provision); Town of Billerica v. Int’l Ass’n of Firefighters, Local 1495, 415 Mass. 692, 693 (1993) (provision providing for seventeen firefighters on duty at any time was a minimum-staffing level provision). The provision mandates a minimum-staffing level requirement that each shift be staffed with eighteen firefighters.
The provision, however, “must be considered in the context of the entire contract rather than in isolation.” Matthews, 72 Mass.App.Ct. at 462. All parts of a contract are to be “construed together as constituting a single and consistent arrangement.” McMann v. McGowan, 71 Mass.App.Ct. 513, 517 (2008), quoting Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 282 Mass. 367, 375 (1933). The City points to language in Paragraph 4(G), “(i]n the event 18 men are on duly, Ladder #2 will be staffed with six employees,” in support of its interpretation that fewer than eighteen firefighters may be on duty. The City contends that in order for the phrase “in the event eighteen men are on duty" to have any effect, the provision requiring eighteen firefighters on duiy at the start of every shift must be interpreted to mean that fewer than eighteen firefighters may be present at the start of a shift. This is unpersuasive. The phrase “in the event 18 men are on duiy” precedes the provision which expressly provides that “as of June 30, 2007" eighteen men shall be on duty. Given that the agreement was in effect from July 1, 2004 to June 30, 2007, ”in the event 18 men are on duty" is reasonably interpreted to apply to those situations, prior to June 30, 2007, when the previous minimum-staffing level provision of seventeen firefighters, found in Paragraph 19(K) of the agreement, was in effect. The seventeen firefighter minimum-staffing provision remained in effect until June 30, 2007, giving the phrase “in the event 18 men are on duty” reasonable meaning. It may also apply to lower staffing levels resulting from a firefighter going off-duty because of, for example, illness.
The City also points to language immediately following the provision in paragraph 4(G): “A copy of the staffing plan is attached for reference herein in Appendix A.” Appendix Ais titled “Fire Dept. Staffing Assignments” and outlines the number of firefighters assigned to each engine and fire station depending upon the number of firefighters staffing each shift. Because Appendix A contemplates situations when the fire department will have less than eighteen firefighters on duly,[5] the City insists that Appendix A must modify the previous provision requiring that eighteen firefighters be on duty. The interpretation encouraged by the City would render superfluous the provision requiring eighteen firefighters on duty at the start of each shift, immediately preceding the reference to Appendix A. Contrary to the City’s assertions, Appendix A is harmonious with the eighteen firefighters on duty requirement. If the City Council does not fund the minimum-staffing level of eighteen firefighters, then the fire department will have no choice but to staff each shift with fewer than eighteen firefighters. It appears that Appendix A was included to address situations, such as the lack of funding or an employee leaving mid-shift, when staffing the department with eighteen employees is not possible. This interpretation “gives reasonable meaning to all [the agreement’s] provisions ... [which is] preferred to one which leaves a part useless or inexplicable.” Worcester Mut Ins. Co. v. Marnell, 398 Mass. 240, 245 (1986).
*474 Finally, the City contends that Section 9(5) of the agreement supports its interpretation that the provision requiring eighteen firefighters on duty only requires that eighteen firefighters be scheduled per shift. Section 9(5) sets forth the number of employees who may take discretionary leave during the same shift. The Ciiy urges that this section allows up to five employees to take the day off, so that at a minimum thirteen firefighters may be on duty during one shift. Again, this interpretation would render meaningless the provision requiring that eighteen employees be on duty at the start of each shift. The guidelines in section 9(5) set forth the maximum number of firefighters who may take discretionary leave during the same shift; they do not set forth the minimum number of firefighters required to be on duly at the start of each shift as the City contends. The vacation guidelines in Section 9(5) are consistent with the minimum-staffing requirement in Paragraph 4(G), and support the interpretation that more than eighteen firefighters must be scheduled to accommodate firefighters who may take discretionary leave pursuant to Section 9(5).
The usual and ordinary meaning of the phrase “subject to funding, as of June 30, 2007, there shall be not less than eighteen employees on duty at the start of each shift,” construed in context of the entire agreement, supports the interpretation that the provision is a minimum staffing provision requiring that eighteen firefighters be on duty, not merely scheduled, at the start of each shift.
For the Union to succeed on the merits, it must demonstrate that the Mayor is obligated under G.L.c. 150E, §7(b) to request funding from the City Council sufficient to staff each shift with eighteen firefighters, and has not yet fulfilled that obligation in her budget request for FY2010. General Laws c. 150E, §7(b) provides: “The [public] employer . . . shall submit to the appropriate legislative body ... a request for an appropriation necessary to fund the cost items contained therein ... If the appropriate legislative body duly rejects the request for an appropriation necessary to fund the cost items, such cost items shall be returned to the parties for further bargaining.” The Mayor is obligated under §7(b) to request an appropriation necessary to fund the provision of the collective bargaining agreement which requires that eighteen firefighters be on duty at the start of every shift. Local 1652, 442 Mass, at 468, citing Town of Billerica, 415 Mass, at 696.
The Mayor’s FY2010 budget proposal included a request for funding sufficient to schedule eighteen firefighters per shift, in addition to $200,000 in overtime. The Mayor’s FY2010 Budget Transmittal Letter to City Council, in a section entitled “Resources Needed to Fully Fund School and City Services,” requests an additional $3,000,000 to be allocated to the fire department “for twenty-four firefighters to ensure that at least 18 report to duty per shift.” The Mayor’s additional funding request in the budget transmittal letter, but not the FY2010 budget, is insufficient to fulfill her obligation under G.L.c. 150E, §7(b). The Mayor is required “to submit a budget that unconditionally and fully fund[s] the staffing provision.” Local 1652, 442 Mass, at 470. The Union is likely to succeed on the merits of its claim that the Mayor is required and has failed to request funding in compliance with the minimum-staffing provision requiring eighteen firefighters to be on duty at the start of every shift.
B. Irreparable Harm to the Union
The next consideration is whether the Union will suffer irreparable harm if this injunction is not granted. Packaging Indus. Group, Inc., 380 Mass. at 617. Irreparable harm is harm that “cannot be vindicated should [the Union] prevail after a full hearing on the merits.” Id. at 616. Judge Feeley denied the Union’s motion for a preliminary injunction to compel the Mayor to fund this identical minimum-staffing provision for FY2009 and FY2010, finding that the Union did not have a substantial likelihood of success on the merits for FY2009, where the Mayor had submitted and the City Council already had approved the budget, and was not likely to succeed for FY2010 where the Mayor had not yet submitted the budget to Ciiy Council. Judge Feeley relied on Town of Billerica in ruling that: “Given the absence of a damage remedy, and the Supreme Judicial Court’s recognition of an equitable remedy, this court rules that if the issues in this case were timely before the court the Union would have demonstrated that without the relief [it] would suffer irreparable harm, not capable of remediation by a final judgment in law or equity.”
Town of Billerica held that a union was not entitled to damages awarded by an arbitrator in the amount that a firefighter would have earned but for the Mayor’s failure to request funding in adherence with the minimum staffing provision. Town of Billerica, 415 Mass, at 696. The Supreme Judicial Court held that when a Mayor fails to submit an appropriations request to fund a minimum-staffing provision in contravention of G.L.c. 150E, §7(b), the Union’s only remedy is in equity “to seek a court order compelling the town administrator, and others, if necessary, to comply with the law and to submit a request for necessary funding to a town meeting.” Id. Here, the City Council is scheduled to review the Mayor’s budget on June 16, 2009. In light of the Union’s likelihood of success on the merits of its claim that the agreement obligates the Mayor to request funding to staff eighteen firefighters per shift, the Union will suffer irreparable harm if the Mayor is not compelled to submit an unconditional funding request to City Council for review at the meeting. If this injunction does not issue, the Union will lose its one opportunity in FY2010 to have the minimum-staffing provision funded in compliance with the agreement.
Judge Feeley aptly recognized the risk of irreparable harm to the Union in his Order denying the Union’s *475 request for an injunction to compel the Mayor to submit a funding request for FY2009. Because the City Council approved and implemented the FY2009 budget, the Union had missed the small window of opportunity prior to the City Council’s approval of the FY2009 budget to enforce its rights and compel the Mayor to request the funding. No damage remedy could compensate the Union for that missed opportunity in FY2009, and no damage remedy will vindicate the Union if it were to prevail after a full hearing on the merits once the opportunity to request funding for FY2010 has passed. The Town qf Billerica decision and Judge Feeley’s Order support the finding that the Union will suffer irreparable harm if the preliminary injunction is not granted.
C. Irreparable Harm to the City and the Public Interest
Because failure to issue the injunction would “subject the [Union] to substantial risk of irreparable harm,” the court must now “balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Packaging Indus. Group, Inc., 380 Mass, at 617. Because the Union seeks to enjoin government action, the court also must consider whether the injunction promotes the public interest, or at least does not adversely affect it. Tri-Nel Mgmt., Inc., 433 Mass. at 219. The Cily submits it will be forced to lay off firefighters if the Mayor is compelled to request more overtime funding to ensure that each shift is staffed with eighteen firefighters. On the other hand, if the injunction does issue, the City will be held to its contractual obligation, and eighteen firefighters are guaranteed, subject to Cily Council approval, to be on duty at the start of every shift. Adequate staffing of a fire department increases the safety of the firefighters, as well as the safety of the public. Weighing the speculative possibility of lay-offs against the increase in public safety that additional firefighters will provide, this court finds that the injunction will not adversely affect the public interest.
Although the dismal fiscal climate in Massachusetts is a valid concern and a factor that this court considers in assessing the risk of irreparable harm to the City, the Ciiy has not demonstrated that its situation is any different than “a situation that all municipalities may face, a budget shortfall and the existence of contractual obligations that need to be funded.” Local 1652, 442 Mass. at 477, citing Mendes v. Taunton, 366 Mass. 109, 113-14 (1974), overruled in part on other grounds, Boston Teachers Union, Local 66 v. School Comm. of Boston, 386 Mass. 197 (1982). The court emphasized that “(t]hese [fiscal] issues are considered by town officials as part of the process of negotiating a collective bargaining agreement.” Id. at 470, n.7 (declining to address city’s argument that fully funded budget request would force further cuts in other departments or new fees to meet its obligations).
Although the Mayor’s “allocation of scarce public resources will inevitably harm some individuals,” this consideration cannot excuse the City from compliance with its contractual obligation to request funding under the collective bargaining agreement. See Healey v. Commissioner of Pub. Welfare, 414 Mass. 18, 28 (1992) (Department of Public Welfare not excused from complying with terms of federal mandate that department provide childcare for recipients, despite harm that may occur to other public assistance recipients whose benefits would be reduced as a result of the department’s re-allocation of funds to comply). In light of the Union’s likely success in proving the existence of a minimum-staffing provision and the Mayor’s obligation to request appropriation to fund that provision, the risk of irreparable harm to the Union if it misses its sole opportunity at the upcoming city meeting for the Mayor to submit a funding request for FY2010 outweighs the speculative harm to the City. Packaging Indus. Group, Inc., 380 Mass, at 617.
ORDER
The plaintiff, Local 762, Int’l Ass’n of Firefighters, A.F.L.-C.I.O.’s, motion for a preliminary injunction is ALLOWED. The defendant, Carolyn Kirk as she is Mayor of the City of Gloucester, is ORDERED to submit a request for appropriation, in an amount sufficient to fund the minimum staffing level of eighteen firefighters at the start of each shift as required by Paragraph 4(G) of the collective bargaining agreement, to the Gloucester City Council for Fiscal Year 2010 before the Ciiy Council vote on the budget, presently scheduled for June 16, 2009.

The collective bargaining agreement consists of several memoranda of agreements that comprise one integrated contract. The terms of the agreement are established by reading the integrated agreement, modified by the series of memo-randa executed in the years following the execution of the integrated agreement. The first agreement applied to the period July 1, 1994 to June 30, 1997; the second agreement extended all terms, except those expressly modified, through June 30, 1998; the third agreement extended all terms, except as expressly modified, through June 30, 2001; the fourth agreement extended all terms, except as expressly modified, through June 30, 2003; and the last agreement, at issue here, extended all terms, except as expressly modified, through June 30, 2007. It is undisputed that because a new agreement has not been executed by the parties, the agreement through June 30, 2007 governs their relationship.

The city maintains that interpretation of the collective bargaining agreement is a subject that must be resolved via the grievance and arbitration process, and that the Union’s failure to follow the process prior to seeking an injunction obviates the likelihood that the Union will succeed on the merits. This case, however, presents unique factual circumstances requiring that this court act to avoid irreparable harm to the parties. Although employees may not simply disregard grievance procedures in favor of judicial intervention, there are limited situations in which the grievance process may be *476 compromised, such as when “the union fails in its duly to represent them fairly in pressing the grievance, or the employer repudiates or otherwise nullifies the grievance ma-chineiy, or the union and the employer contrive together to subvert it. Balsavich v. Local 170, Int’l Bhd. of Teamsters, 371 Mass. 283, 286 (1976). Here, the Mayor submitted her budget for FY2010 on May 5, 2009. The Union filed its complaint for Injunctive Relief and Declaratoiy Judgment on May 21, 2009. The City Council is scheduled to review and approve the Mayor’s recommended budget on June 16, 2009. If tiie Union had filed a grievance, an employee would have first engaged in an informal discussion with the City. Then the employee would have submitted a grievance within fourteen calendar days of the occurrence to the City. If the grievance remained unsettled, it would have been presented to the Chief of the Department within fourteen calendar days after the decision of the party or member causing the grievance. The Chief of the Department would have had another fourteen days from the date he received the grievance to render a decision in writing. After the Chiefs decision, the employee could have informed the Union Representative within seven days if dissatisfied, who would have notified the Mayor. Within ten days the Mayor would have made a decision to the Union Representative and Chief of the Department. If the decision was unsatisfactory to either party, after giving notice within fifteen days, the parties could have then requested that the matter be resolved by arbitration.
Given the short time period of six weeks between the date on which the Mayor submitted her proposal and the date of the City Council meeting to review the proposal, this court finds that resort to the potentially lengthy grievance process would have been futile. In light of the irreparable harm facing the Union, namely the lost opportunity to request funding for FY2010 discussed in detail infra, the Union’s effort to secure a preliminary injunction prior to the City Council’s meeting on June 16, 2009 is appropriate. See Town of Billerica v. Int’l Ass’n of Firefighters, Local 1495, 415 Mass. 692, 696 (1993) (finding that union’s remedy to compel Mayor to comply with obligation to submit funding request was to seek preliminary injunction prior to town meeting).

Appendix A sets out staffing schedules for scenarios when the fire department is staffed with thirteen to nineteen firefighters.